**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| FRANK REED, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 12-2934 (MAS) (DEA) |
| | : | |
| v. | : | **MEMORANDUM OPINION** |
| | : | |
| CITIGROUP, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**SHIPP, District Judge**

Plaintiff Frank Reed ("Reed" or "Plaintiff") brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, challenging the decision of Defendant Metropolitan Life Insurance Company ("MetLife")[1] to terminate his ongoing claim for long-term disability ("LTD") benefits under the Citigroup Inc. ("Citigroup")[2] (collectively, with MetLife, "Defendants") Disability Plan (the "Plan"). The Plan was established and maintained by Citigroup and the LTD benefits provided by the Plan are funded by a group policy of LTD insurance issued by MetLife. Before the Court are cross-motions for summary judgment brought by Plaintiff and Defendants. (ECF Nos. 48, 49.) The Court decides these motions without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

---

[1] Incorrectly pleaded as "MetLife Group, Inc. and Metropolitan Life Insurance Company."

[2] Incorrectly pleaded as "Citigroup, Inc."

## I.      **Background**

Reed was hired by Citigroup as a financial advisor on or about March 10, 2008. Reed's disability insurance under the Plan went into effect on April 9, 2008. On that same date, Reed allegedly fell at a Champs Restaurant during a company-sponsored event and never returned to work.

On April 24, 2008, Reed telephoned MetLife and stated that he was unable to work at his job as a financial advisor because he fell at a restaurant and had lower back pain and disc problems. (*See* Defs.' Statement of Uncontested Material Facts ¶ 7; ML[3] 1211-13.) His treating physician at the time, Shanthi Subbiah, M.D., submitted a note on a blank prescription pad, which stated, "Because of severe injury to the coccyx . . . [patient] is unable to sit down & thus unable to work." (ML 1207.) MetLife sought and obtained information regarding Reed's job duties from Citigroup. Citigroup informed MetLife that Reed's official job title was "financial advisor associate," and his job duties were as follows:

> 1[st] 6 months: learning info need[ed] to know to pass Series 7 security exam then will become a financial advisor. [Employee] has only been there [for] under a month.

(ML 0161-62.) Citigroup advised MetLife that there was no lifting, carrying, pulling, or pushing requirements of the job and that accommodations were available. (*Id.*)

Reed's claim for salary continuation benefits was initially approved on May 7, 2008, approving the claim from April 18, 2008, through April 25, 2008. (*See* ML 1205.) Subsequently, MetLife continued to request, and Dr. Subbiah continued to submit, medical records on Reed's

---

[3] For ease of reference, the Court will reference the Bates Stamped numbers indicated on the administrative record maintained by MetLife with respect to Reed's claim for LTD benefits. (*See* Certification of Matthew Hallford ("Hallford Cert."), Ex. B., ECF Nos. 48-5 through 48-16.)

behalf. (*See* ML 1195-1202, 1162-78.)  Reed was paid salary continuation benefits through July 9, 2008, the maximum period under Citigroup's salary continuation plan. (*See* ML 1159.)

Thereafter, Reed submitted a claim for LTD benefits, stating that he "can not [sic] sit nor can [he] stand for any length" of time. (ML 1081.)  MetLife originally sought medical records from Dr. Subbiah and Luis Cervantes, M.D., the treating physicians identified by Reed on his Employee Statement.  By correspondence dated September 17, 2008, Dr. Cervantes stated that Reed slipped at a work-related function, fell on his buttocks, and since then has had lower back pain.  He further stated that Reed was sent for an MRI, but that no conclusions were drawn as a result of the MRI because it was of extremely poor quality.  Dr. Cervantes recommended that another MRI be performed but found that Reed had cauda equina syndrome and suspected he may have a low thoracic or high lumbar disc that was compressing the neural structures. (*See* ML 1065-66.)

On or about August 27, 2008, MetLife approved Reed's claim for LTD benefits. (*See* ML 1118-19.)  The correspondence specified that to receive LTD benefits, Reed "must be disabled as defined by the [P]lan" and cited to the relevant provision.  It also explained that the monthly benefits would end if certain events occurred, such as if Reed was no longer disabled or no longer provided MetLife with certain information. (*See id.*)

MetLife continued to request information to evaluate Reed's claim for continuing LTD benefits; however, Reed failed to provide the documentation requested. (*See* ML 0922-38.)  On February 10, 2009, MetLife advised Reed that his claim would be denied as there was no documentation supporting medical treatment or disability subsequent to October 2008. (*See* ML 0922-25.)  On the same date, MetLife also reached out to Dr. Subbiah, and requested medical records and an attending physician's statement. (*See* ML 0926-28.)  After MetLife received no

3

response from Dr. Subbiah, MetLife again reached out to him on March 2, 2009. (*See* ML 0853-56.) Dr. Subbiah responded on or about March 3, 2009, and refused to provide medical records, indicating "patient has not been seen here since 7-16-08. Patient has moved to another state." (ML 0851-52.)

On March 10, 2009, and in response to MetLife's notice of potential claim denial, Reed faxed to MetLife a three-page correspondence dated October 7, 2008, from Sidney Tobias, M.D., directed to Plaintiff's workers' compensation attorney. (*See* ML 834-37.) Dr. Tobias diagnosed Reed as follows:

1.  RESIDUALS OF CONTUSION AND SPRAIN OF THE LUMBAR SPINE;

2.  BONEY DEGENERATIVE CHANGES WITH BULGING DISC AT L-3-L4 AND L4-5 WITH CENTRAL DISC HERNIATION AT L5-S1;

3.  LEFT LUMBAR RADICULOPATHY.

(ML 0837.) Dr. Tobias opined that there was "objective medical evidence of restriction of function and lessening to a medical degree of working ability as well as interference with the ability to perform activities of daily living." (*Id.*) He concluded, however:

> It is my professional opinion with a reasonable degree of medical probability that this Petitioner has not been thoroughly diagnosed and obviously has received no treatment whatsoever. I would strongly recommend that he return to Dr. Cervantes and undergo the additional diagnostic studies advised with further therapy to be determined upon results of those studies.

(*Id.*)

By correspondence dated March 13, 2009, MetLife advised Reed that his claim was being denied because MetLife still had not received an attending physician's statement or medical records from October 2008 to present. (*See* ML 0820-21.) On that same day, Reed submitted an "Initial Visit Note" of Steven H. Deschner, M.D., PhD. (*See* ML 0814-19.) The note stated that

Reed sought consultation from Dr. Deschner on February 18, 2009.  Dr. Deschner described

Reed's condition as follows:

> He describes his pain a[s] severe 7-9/10 in severity mainly around the anus
> area and the left hip, left lower back, and left thigh.  Pain does not go to the
> feet.  It is a constant pain, markedly interferes with his sitting [sic].  He cannot
> sit more than 10 minutes before he can stand.  He cannot lie comfortably in
> bed.  No position he feels comfortable [sic].  Pain markedly affects his social
> function and his activities of daily living.  The pain is 50% in his back, 50%
> in his left lower extremity.  Sitting, lying on the back, coughing or sneezing,
> walking, or bending forward markedly increases his pain.  Pain slightly or
> partially decreased by lying on the side.  He has been taking Motrin over-the-
> counter, two tablets 2-3 times per day and Tylenol 500 mg every 4-6 hours
> for pain now.  He used to take some Percocet, but he has not taken narcotic
> medicine for the past 3 months.   Patient denies any physical therapy
> treatment.  He denies injection or surgery.

(ML 0815.)  Dr. Deschner found that radiology of the sacrum coccyx revealed a 3mm offset, and

that an MRI from May 2008 revealed degenerative disc changes at L3-4, L4-5, L5-S1, as well as

a central disc herniation at L5-S1.  He did not believe that the cauda equina syndrome caused

Plaintiff's complaints of bowel incontinence.   Dr. Deschner scheduled an appointment with

Yaoming Gu, M.D., to evaluate Reed for injection therapy and for other potential treatment.  Dr.

Deschner opined that injection therapy would alleviate Reed's pain and allow him to sit.  He

scheduled Plaintiff to return in a month.  (*See* ML 0817-18.)

By correspondence dated March 23, 2009, Reed's benefits were reinstated effective March

14, 2009.  (*See* ML 0812-13.)  The correspondence again specified that to receive LTD benefits,

Reed "must be disabled as defined by the [P]lan," and cited to the relevant provision.  It also

explained that the monthly benefits would end if certain events occurred, such as if Reed was no

longer disabled or no longer provided MetLife with certain information.  (*Id.*)

Thereafter, Plaintiff submitted an "Initial Visit Note" from Dr. Gu and his office, dated

April 23, 2009.  (*See* ML 0797-800.)  The note explained that Reed was offered surgery treatment

after his accident but declined it. Dr. Gu assessed Reed as having "coccydynia and left radicular pain." (ML 0799.) He also found that Reed had positive Trendelenburg sign on the left.[4] (*See* ML 0800.) His treatment plan for Reed was as follows:

1. We will set Mr. Reed up for an MRI of his lumbosacral spine. Also, plain films of the lumbosacral spine 6 views, AP, lateral obliques, flexion, and extension. Follow up thereafter.

2. Refill of Percocet was approved by Dr. Deschner for 2-week supply.

3. The patient will follow-up with Dr. Deschner within the 7 to 10 days for management of the narcotic.

4. We will see the patient back after the MRI and discuss treatment options.

(ML 0799.)

On July 16, 2009, a MetLife nurse consultant called Reed. Reed advised that he did not go back to Dr. Gu or have the suggested MRI performed. (*See* ML 0280-82.) Reed further stated that he was now working with Michael C. Mulvaney, D.C., and his treatment with Dr. Mulvaney included physical therapy. (ML 0282.) On July 22, 2009, MetLife received an attending physician's statement and medical records from Dr. Mulvaney. (*See* ML 0763, ML 0764-82.) Dr. Mulvaney's statement provided that Reed's primary diagnosis was herniated disc and his secondary diagnosis was sciatica. (*See* ML 0763.) Dr. Mulvaney further stated that Reed's physical capacities were limited to sitting 0 hours, standing 0-1 hours, and walking 0-1 hours but that he expected improvement "in 4 to 8 weeks of treatment." (ML 0767.) Dr. Mulvaney recommended non-surgical spinal decompression and chiropractic physical therapy. (*See* ML 0767-68.) There is no evidence in the record indicating that Reed underwent any of this treatment.

---

[4] A positive Trendelenburg sign occurs if, when an individual is standing on one leg, the pelvis drops on the side opposite of that leg, instead of rising. *See Dorland's Illustrated Medical Dictionary* 1901 (32nd ed. 2011). It indicates "disturbance of the gluteus medius mechanism, such as deformity of the femoral neck, dislocation of the hip joint, or weakness or paralysis of the gluteus medius muscle." *Id.*

Subsequently, MetLife sought and obtained an independent physician review of Reed's file. Lucia McPhee, M.D., reviewed Reed's entire medical file and issued a report and opinion dated August 25, 2009. (*See* ML 0751-58.) Dr. McPhee spoke with Dr. Mulvaney who advised that he did not actually treat Reed: "When the claimant came in on 7/1/09, 7/9/09 and 7/29/09, this was basically to discuss his case." (ML 0756.) Dr. McPhee did not call Drs. Gu or Deschner because both physicians had only seen Reed on one occasion. Dr. McPhee, after reviewing all of Reed's medical records, concluded as follows:

> In summary, the claimant is a 42 year old obese financial advisor who reportedly slipped and fell onto his buttocks on 4/9/08, and has continued to have buttock and low back pain with symptoms into the lower extremities. Investigations have included x-rays, MRIs, and a bone scan. Although there was mention of 3 mm anterolisthesis at the sacrococcygeal junction on x-rays from 4/14/08, the MRI from 4/21/08, with special attention to this region, specifically noted no evidence of an occult fracture or listhesis. As well, a bone scan was unremarkable in this region. The most recent lumbar MRI was from 5/20/08. This showed some degenerative changes and mentioned a central herniation at L5-S1, but there was no focal nerve root entrapment or compression . . . . Clinical examinations did not document specific findings of a radiculopathy. There may have been a component of radiculitis. He did not proceed with further imaging studies as recommended by Dr. Deschner on 2/18/09. He did see Dr. Gu at the spine center at the recommendation of Dr. Deschner. Dr. Gu noted that the claimant did not have any injection therapy or physical therapy for this. It does not appear that the claimant obtained the x-rays or MRI that Dr. Gu recommended, and did not return to discuss treatment options. Consultation with Dr. Mulvaney for chiropractic treatment on 6/18/09 noted continued symptoms, as did my discussion with Dr. Mulvaney on 9/1/09 . . . . It is unclear why the claimant has not proceeded with any treatment, even with the chiropractor. His symptoms should have improved by July 1, 2009, but according to Dr. Mulvaney, they have persisted. Based on the imaging studies and limited findings on clinical examination, the possible intermittent nerve root irritation should not preclude a sedentary level of activity. Also, coccydynia should improve with conservative treatment such that it should not preclude a sedentary level of activity with brief position change as needed by the 7/1/09 date in question, which is almost 15 months out from his injury. This 15 month time period should have given him ample opportunity to follow through with a health care provider for treatment trials.

(ML 0757-58.)  With regard to appropriate care and treatment, Dr. McPhee stated that Reed was prescribed pain medication early on, "but other than that it appears he has not had any significant treatment specific for his symptoms." (ML 0758.)   She noted that Plaintiff has not "adequately followed through with" the providers of his imaging studies and evaluations, did not attend physical therapy even though it should have been helpful, did not undergo injection treatment, and overall "did not appear to follow through with recommendations provided by his specialist or chiropractor." (*Id.*)

By correspondence dated September 18, 2008, MetLife sent Dr. Mulvaney, as Plaintiff's alleged treating physician, a copy of Dr. McPhee's report.  MetLife requested Dr. Mulvaney to provide comment if he was not in agreement with the report's findings, with relevant clinical findings and office visit notes to support his opinion.  (*See* ML 0712.)  On October 8, 2009, Dr. Mulvaney responded, stating:

> With regard to the progress of Frank Reed, I cannot say what his physical limitations should or should not be by a specific date because he has had no treatment in this office.  An examination was done on 6/18/09.  When I saw Frank 7/1/09, 7/9/09 and 7/29/09 [sic], he appeared to have the same degree of pain; however, an examination was not performed on those dates.  He has not had any treatment of any kind, so if a recent examination was conducted, I would expect the findings to be similar to the previous findings.  I agree with Dr. Gu that a different MRI, perhaps seated, would reveal more data.

(ML 0709.)  No clinical findings or office visit notes were provided to support his opinion.

On November 3, 2009, MetLife notified Reed that it had determined that he was no longer disabled as defined by the Plan and that his claim for continuing LTD benefits was denied effective November 3, 2009.  (*See* ML 0692-94.)  In order to be considered disabled under the Plan, Plaintiff had to have been "receiving Appropriate Care and Treatment from a Doctor on a continuing basis and . . . unable to earn more than 80% of [his] Predisability Earnings or Indexed Probability Earnings at [his] Own Occupation for any employer in [his] Local Economy." (ML 0692.)  At the

time Reed's claim was denied, no physician opined he was disabled, and medical documentation evidenced that he was receiving no treatment for a condition he asserted rendered him disabled. MetLife explained:

> Based on the medical information provided by your current treating sources there is no documentation regarding your level of functioning. Early on it was noted that you were prescribed pain medication however [sic], other than the consultation for the chiropractic treatment you have not had any significant treatment. The information supplied by Dr. Mulvaney does not support that you are prevented from performing your sedentary level occupation as a Financial Advisor and your claim has been terminated.

(ML 0693.) Reed was notified of his right to appeal the claim determination. (*Id.*)

On or about April 29, 2010, MetLife received correspondence from Reed's counsel dated April 23, 2010, stating that he was "formally appeal[ing]" the claim determination. (*See* ML 0686-87.) The correspondence included two letters, addressed "to whom it may concern," from Helen B. Adams, M.D., dated February 8, 2010, and March 31, 2010, respectively. (*See* ML 0684-85.) The correspondence stated that Dr. Adams saw Reed at her office on January 12, 2010, and that he had developed spinal stenosis, herniated disc, and a coccyx dislocation, and that he had chronic lower back pain. (*See id.*) Dr. Adams opined that Reed was "unable to work (disabled from working) at his 'own occupation.'" (*Id.*) Thereafter Reed, through counsel, requested documentation from MetLife and additional time to submit an appeal. (*See* ML 0661-77.)

By correspondence dated August 6, 2010, Reed submitted documents in support of his appeal. (*See* ML 0566-660.) Of relevance, Reed submitted a personal affidavit, in which he indicated that his insurance would not cover any treatment stemming from his injury until May 2009 because of a dispute over whether his health insurance or his employer's workers' compensation insurance should cover such costs. In June 2009, Reed stated that he met with Dr. Mulvaney and chose a non-invasive course of treatment called spinal decompression. He stated

that this treatment was not covered by insurance, and he was saving for the $7,000 cost of the treatment when his LTD benefits were terminated. (*See* ML 0569-70.)

Reed also submitted certain medical documents. He submitted correspondence dated August 2, 2010, from Elliott Skorupa, MSEP, which stated that Reed was referred for a functional capacity evaluation, but it was not performed because Reed was "not medically stable." (ML 0590.) Despite not performing a functional capacity evaluation, Mr. Skorupa concluded that "it is very apparent to me that Mr. Reed is disabled from gainful competitive activity at any physical demand." (*Id.*) Reed also submitted correspondence, dated June 24, 2010, and an initial office visit note, dated April 29, 2010, from Howard G. Stern, M.D. (*See* ML 0594-95.) The correspondence from Dr. Stern stated that Reed had sought treatment or consultation from him on two occasions on April 29, 2010, and May 27, 2010, and that he referred Reed for an MRI because he believed Reed's symptoms may be consistent with a possible cauda equina syndrome. (ML 0592.) It further stated that Dr. Stern "offered Mr. Reed a provisional 30-day work restriction note," and that he "wanted to review a current upright MRI scan on Mr. Reed before [he] would opine on issues of long-term disability." (ML 0593.)

The medical records also included the aforementioned correspondence from Dr. Adams and her office visit notes dated January 12, 2010. (*See* ML 0601-10.) In her office visit notes, Dr. Adams stated that Reed had "spinal stenosis, HNP, and coccyx dislocation" and recommended Reed continue with ibuprofen and Tylenol for pain. The correspondence also noted that she "encouraged the patient to proceed with injection therapy, as recommended by his pain doctor, and he will consider." (ML 0602.) Reed also submitted to MetLife records from V. Sabharwal, M.D., of Cardiovascular Associates of Virginia. (*See* ML 0630-43.) Finally, Reed resubmitted medical records, including those from Drs. Deschner and Gu. (*See* ML 0620-29, 0644-60.)

10

By correspondence dated August 18, 2010, Reed submitted another copy of Mr. Skorupa's August 2, 2010 correspondence and a report from an MRI of Reed's lower lumbar spine dated June 29, 2010.  (*See* ML 0531-34.)  The impression from the MRI was:

1.   L3-4 mild shallow diffuse disc bulging contributes to mild bilateral foraminal narrowing.

2.   L4-5 mild shallow diffuse disc bulging contributes to mild bilateral foraminal narrowing.

3.   L5-S1 mild predominantly central disc bulging without stenosis.

(*See* ML 0534.)

MetLife subsequently sought review of Reed's medical files by a Board certified cardiologist.  MetLife retained Elite Physicians LTD, which obtained an independent medical review from Raye L. Bellinger, M.D., M.B.A., F.A.C.C., F.S.G.C., Board certified in Internal Medicine, Cardiovascular Disease and Nuclear Cardiology, on or about August 24, 2010.  (*See* ML 0550-53.)  Dr. Bellinger performed a review of Reed's entire file and issued a report and opinion dated September 2, 2010.   In his report, Dr. Bellinger concluded that, "from a cardiovascular standpoint, the medical information does not support functional limitations beyond 11/03/09."  (ML 0552.)  Dr. Bellinger based his conclusion on the following:

Dr. Sabharwal performed an echocardiogram, which only revealed mild left atrial enlargement and patent foramen ovale.  There were no other significant clinical findings.

Dr. Sabharwal started the claimant on Meteprolol with excellent improvement in heart rate control and symptoms.  Although, the patient has ongoing atrial flutter, there is no clinically significant reason that should be limited and restricted in his ability to perform his full time work on that basis.  Heart rate control is the most important part of atrial flutter and it appears as though the treating provider has achieved such heart rate control.

(ML 0552-53.)

MetLife also sought review of Reed's records by a Board certified orthopedic surgeon. The review was performed by Howard P. Taylor, M.D., Board Certified Orthopedic Surgeon. Dr. Taylor reviewed Reed's entire file and issued an opinion and report dated August 27, 2010. (ML 0540-49). Dr. Taylor attempted to speak with Drs. Stern, Adams, and Gu. While Dr. Stern did not return his telephone calls, Dr. Taylor did speak to Dr. Adams and memorialized his conversation with her in his report, in pertinent part, as follows:

> [E]verything she said on 01/12/2010 note was based upon what Mr. Reed told her. She had no records to review at that time. She was not aware of the legal aspects and in hindsight she should have been more cautious. She said she is not an orthopedic surgeon or neurosurgeon or physiatrist and did not feel qualified to determine if he is able to work. She said she cannot be the final word. I explained to her that she's the only doctor after January of this year who is certifying to his inability to perform his own occupation. She told me that it was based solely on what he had told her earlier.

(ML 0545-46.) Dr. Taylor also spoke with Dr. Gu. Dr. Taylor asked him if Reed had any restrictions or limitations in April 2009 when he examined Reed. Dr. Gu responded that he did not focus on activity limitations; therefore, he did not have an opinion on that issue. Dr. Gu also stated that Reed had not been back to see him. (*See* ML 0546.)

Dr. Taylor, after reviewing Reed's entire file and speaking with the aforementioned doctors, concluded that there was "no clinical evidence to support restrictions and limitations and/or side effects resulting from the medication beyond 11/03/2009." He reasoned:

> Dr. Adams told me that she based her opinions on what Mr. Reed told her. The current MRI does not support radicular type pain or pain localized to the coccyx area. The current MRI does not support bladder or bowel incontinence and is not consistent with a cauda equina syndrome. Dr. Stern did not return my call but he did say that he would defer his opinion on long term impairment pending the result of the MRI. The MRI is not consistent with permanent impairment. Mr. Reed did not suffer a fracture of his coccyx in his fall. The x-ray showed a 3 mm anterolisthesis at the MRI specifically said [sic] there was no evidence of anterolisthesis. In any event a 3 mm anterolisthesis of the coccyx would not be consistent with a cauda equina syndrome and would not be consistent with bowel or bladder incontinence.

12

> It would not be consistent with an antalgic gait.  I disagree with Mr. Skorupa in his ability to assess an individual's capability of performing gainful competitive activity at any physical demand level without performing any testing.  When I spoke with Pam at Dr. Stern's office, she told me that because of a change of insurance Mr. Reed is no longer treated with Dr. Stern.  Based on the medical records, Mr. Reed has been to see physicians after 11/03/2009 for evaluation but has not been seen for treatment.  According to Dr. Adams he was recommended to go for injection therapy and she encouraged him to go as well but there is no record that it was ever done.

(ML 0548-49.)

Thereafter, Dr. Stern forwarded updated medical records to Dr. Taylor, which indicated that Reed had sought treatment and/or consultation with Dr. Stern on July 8, 2010.  During this visit, Dr. Stern reviewed Reed's recent MRI and found that it showed disc disassociation at the lowest three levels and a central disc bulge with slight right asymmetry at L5-S1.  Dr. Stern stated that he "advised the patient that [he] did not see any cauda equina compression on his current lumbar spine MRI," and that he did not see "any lumbar source of bowel and/or bladder incontinence" or "a source for left lumbar radiculopathy."  (ML 0525.)  Dr. Stern recommended that Reed see a specialist for his complaints of incontinence and referred Reed to a spine center for nonsurgical treatment for his low back pain, because Reed did not want surgical treatment.  Overall, Dr. Stern concluded:

> I advised the patient regarding his request for disability certification that I do not find sufficient evidence of disability at this time for me to agree to certify him as being disabled without objective evidence of disability.  With that in mind, I recommended that we refer him for a functional capacity evaluation to objectively confirm the extent of his disability.[5]

(ML 0525.)

---

[5] While submitted to MetLife and Dr. Taylor later, this recommendation appears to have been the impetus for Reed seeking the functional capacity evaluation from Mr. Skorupa.

MetLife requested that Dr. Taylor review these additional records. After reviewing these records, Dr. Taylor issued an addendum report dated September 14, 2010, in which he concluded that the additional files from Dr. Stern did not alter his original medical opinion:

> There is no medical evidence now and there has not been medical evidence to support Mr. Reed's complaints of unremitting back pain, pain in the coccyx, pain radiating down the left lower extremity to the left foot or of bowel/bladder incontinence. Dr. Stern's clinical examination on 07/08/2010 is not consistent with his complaints. The MRI of 06/29/2010 is not consistent with his complaints.

(ML 0516.)

By correspondence dated January 21, 2011, MetLife upheld the claim determination on appeal. (*See* ML 0473-79.) In its appeal determination, MetLife reviewed the complete administrative record and concluded:

> [A]lthough we acknowledge that Mr. Reed has a condition that your client believe [sic] renders him disabled, the impairment level he reported does not correlate with the medical findings on file. While his report of an inability to work due to radiating back pain, burning and numbness, lack of mobility, bowel and bladder urgency/incontinence and cardiac flutter was carefully considered, there were no significant clinical findings to support functional impairment to preclude Mr. Reed from performing full-time work beyond November 3, 2009. Also, while we note that Mr. Reed has a history of depression, there was no psychiatric treatment records submitted or documentation to support that Mr. Reed has a psychiatric condition that rose to the level of impairment. As such, the previous decision to terminate Mr. Reed's LTD benefits beyond November 3, 2009 has been upheld and remains in effect.

(ML 0478.) Reed was advised that he had "exhausted his administrative remedies under the Plan, and no further appeals [would] be considered." (*Id.*)

Thereafter, by correspondence dated January 24, 2011, Reed submitted an electrodiagnostic study dated January 4, 2011, from RA Pain Services, P.A. (ML 0464-71.) The study was conducted by Mohsin Sheikh, M.D. (*See* ML 0465.) According to Dr. Sheikh, it was an "abnormal electrodiagnostic study" that evidenced a left-sided S1 radiculopathy. (ML 0465.)

14

There was also evidence that suggested a nerve root irritation on the right side, but this was not supported by the remainder of the examination in the right lower extremity. There was no evidence for a plexopathy or a peripheral neuropathy based on the examination. Overall, the study stated that, taken with Reed's other symptoms, it may show cauda equina syndrome superimposed with radiculopathy. (*See id.*) The study indicated that Reed would benefit from injections, or from surgery if Reed was against more conservative care. (*Id.*)

In addition, by correspondence dated February 9, 2011, Reed submitted correspondence from Dr. Stern, dated January 25, 2011. (*See* ML 0461.) This correspondence stated, in its entirety:

> I have reviewed your letter to me dated January 17, 2011 and the accompanying records from RA Pain Services, P.A.
>
> In my medical opinion, to within a reasonable degree of medical certainty, Mr. Reed is not medically capable of being gainfully employed as a stockbroker.

(ML 0462.) Reed also submitted correspondence dated January 26, 2011, from Mr. Skorupa. Mr. Skorupa stated in the correspondence that Reed had "MRI studies revealing disc protrusion at L3-4 and L4-5 with evidence of frank disk herniation at L5-S1" and that the study "implicates foraminal encroachment, (nerve root displacement) which certainly gives credence to his complaints of radicular symptoms." (ML 0431.) Mr. Skorupa also stated that, "It is very unlikely that given the totality of Reed's lumbar pathology and pattern of radiculopathy that he would be able to sustain a predictable level of work even in sedentary physical demand occupations which would include work as a stock broker." (*Id.*)

By correspondence dated February 21, 2011, Reed submitted correspondence from Gary Buck, M.D., of RA Pain Services, P.A., dated February 1, 2011. Dr. Buck responded to three questions regarding the functional physical limitations of Reed and whether Reed was receiving

15

appropriate treatment and care.  In response to the question of whether the medical information supported functional physical limitations beyond July 1, 2009, Dr. Buck stated, "My response is clearly yes." (ML 0456.)  He stated that Reed had left L5-S1 radiculopathy and that his exam was consistent with cauda equina syndrome, but gave no explanation for what he believed Reed's functional limitations would be, including whether it prevented him from working full-time. (*See id.*)  In response to questions regarding Reed's treatment and care, he concluded that Reed was not under the appropriate care of a physician and that he was not receiving appropriate treatment. (*See* ML 0456-57.)

MetLife sought review of the additional records by Dr. Taylor.  Dr. Taylor reviewed the records and issued an addendum report dated March 9, 2011, in which he concluded that the additional medical documentation did not alter his original determination.  (*See* ML 0443-46.)  First, Dr. Taylor noted that the medical examinations of Reed conducted by Dr. Sheikh on January 4, 2011, and by Dr. Stern on July 7, 2010, were significantly different, and, because there were no medical records to review between those times, Dr. Taylor had no way of knowing if anything happened to change Reed's condition.  (*See* ML 0445-46.)  Dr. Taylor then concluded:

> In my previous review I was asked to opine if the medical information supports functional limitations beyond 11/03/2009.  Since the new information is different from the information I had prior to 11/03/2009 it does not change my previous opinion.  The medical information that was previously presented did not support functional restrictions and limitations after 11/03/2009.
>
> Dr. Stern sent a letter saying he did not feel Mr. Reed could function as a broker.  However, he does not say in his letter what he bases this on.  He previously said, "I do not find sufficient evidence of disability at this time for me to agree to certify him as being disabled without objective evidence of disability."  If Dr. Stern saw Mr. Reed after July 2010, we do not have those records.
>
> Mr. Skorupa sent a letter saying the study implicates foraminal encroachment, (nerve root displacement) which certainly gives credence to

his complaints of radicular symptoms.  However, Dr. Stern reported that there was no neurologic impingement on this study.  The radiologist impression was 1) L3-4 mild shallow diffuse disc bulging contributing to mild bilateral foraminal narrowing. 2) L4-5 mild shallow diffuse disc bulging contributes to mild bilateral foraminal narrowing. 3) L5-S1 mild predominantly central disc bulging without stenosis.  In the body of the report he says at L5-S1 there is no significant central spinal or foraminal stenosis.  He says there is no displacement of the emerging S1 nerve roots.  This is not consistent with what Mr. Skorupa is saying.

(ML 0445-46.)

MetLife also requested that Dr. Bellinger review the additional records.  Dr. Bellinger similarly concluded that the records did not change his general opinion.  (*See* ML 0440-41.)

Reed was permitted an opportunity to submit additional medical records.  On May 6, 2011, MetLife received by facsimile transmission an additional affidavit from Reed and certain other medical records.  Along with additional copies of records previously provided, Reed submitted certain new documentation.  (*See* ML 0422-37.)  Among these documents was correspondence from Nirav K. Shah, M.D., F.A.C.S., dated March 30, 2011.  In this correspondence, Dr. Shah concluded:

> In summary, based on the MRI, examining Mr. Reed and exhaustively reviewing his past medical history (including his recent EMG), along with his job description, it is my opinion, within a degree of medical probability, that the patient is unable to perform the activities required of his job and is unable to be gainfully employed due to his disability, and is not a suitable surgical candidate.

(ML 0426.)  Reed also submitted the report of Todd M. Lipschultz, M.D.  (*See* ML 04333-37.)  Dr. Lipschultz conducted an independent medical examination on behalf of a third-party law firm on March 19, 2011.  Dr. Lipschultz's impression, as stated in the report, was:

1.   Lumbosacral sprain/strain.

2.   Left-side S1 radiculopathy.

3.   Apparent cauda equine syndrome.

17

(*See* ML 0436.)  In the discussion section of his report, Dr. Lipschultz noted that doctors in Virginia questioned the diagnosis of cauda equina syndrome.  Dr. Lipschultz observed that the results of the MRI would not typically cause cauda equina syndrome, and he further noted that Dr. Sheikh thought that the results of the EMG coupled with Reed's symptoms "could be cauda equina syndrome superimposed with radiculopathy."  (*Id.*)  Accordingly, Dr. Lipschultz stated that the cauda equina syndrome was not confirmed.  (*Id.*)  Finally, Reed also submitted medical records from RA Pain Services, P.A.  (*See* ML 0429.)  In addition, MetLife received correspondence from Reed's counsel, dated May 9, 2011, "disputing" the claim decision.  (*See* ML 0418-24.)

The additional records were reviewed by a MetLife Nurse Consultant who explicitly noted that the records provided were not the missing records referenced by Dr. Taylor and did not relate to the period of time under appeal review.  (*See* ML 0386-88.)  He recommended no further clinical action.  (*See* ML 0388.)

By correspondence dated May 24, 2011, MetLife again upheld the claim determination. The correspondence concluded:

> We note that there was no additional medical records submitted for the period July 8, 2010 to January 4, 2011 referenced by the Orthopedic consultant or for the period beyond November 3, 2009 and does not alter [sic] the previous appeal decision.  As such, the medical information does not alter the prior determination to uphold [sic].

(ML 0406.)  Thereafter, on May 15, 2012, Reed initiated this lawsuit.

## II.  **Standard of Review**

### A.  **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The substantive law identifies

which facts are material.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Williams v. Borough of West Chester*, 891 F.2d 458, 459-60 (3d Cir. 1989)

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court will not "weigh the evidence and determine the truth of the matter" but will determine whether a genuine dispute necessitates a trial. *Anderson*, 477 U.S. at 249.  While the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250.  If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (internal quotation marks omitted).  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine dispute of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**B.    Applicable ERISA Standard of Review**

Plaintiff filed suit under Section 502(a)(1)(B) of ERISA, which allows the beneficiary of a covered policy to bring a civil action to recover benefits due under the terms of the relevant plan.

29 U.S.C. § 1132(a)(1)(B).  Courts review the denial of benefits under ERISA "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Where, like here, the plan document gives the fiduciary discretion to determine eligibility for benefits, courts apply the deferential arbitrary and capricious standard of review.  *See O'Sullivan v. Metro. Life Ins. Co.*, 114 F. Supp. 2d 303, 307 (D.N.J. 2000) (citing *Firestone Tire*, 489 U.S. at 115; *Orvosh v. Program of Grp. Ins. for Salaried Emps. of Volkswagen of Am.*, 222 F.3d 123, 128-29 (3d Cir. 2000)).

"An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (internal quotation marks omitted).  Substantial evidence exists when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal quotation marks omitted) (citing *Soubik v. Dir., Office of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004)).  In other words, courts reviewing an administrator's decision must determine whether the decision was without reason.  Courts should "affirm [the administrator's] determination as long as it is supported by substantial evidence in the record, even if the record also contains substantial evidence that would support a different result."  *Johnson v. UMWA Health & Ret. Funds*, 125 F. App'x 400, 403 (3d Cir. 2005) (citing *Moats v. United Mine Workers of Am. Health & Ret. Funds*, 981 F.2d 685, 689 (3d Cir. 1992); *Orvosh*, 222 F.3d at 129). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits."  *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation marks omitted); *see also Vitale v. Latrobe Area*

*Hosp.*, 420 F.3d 278, 282 (3d Cir. 2005) (explaining that a decision "will be overturned only if it is clearly not supported by the evidence in the record" (internal quotation marks omitted)).

When courts review the decisions of ERISA plan administrators or fiduciaries, they "should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). Because "benefits determinations arise in many different contexts and circumstances . . . the factors to be considered will be varied and case-specific." *Id.* at 526 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116-17 (2008)). Overall, courts should "take account of several different considerations of which a conflict of interest is one, and reach a result by weighing all of those considerations." *Estate of Schwing*, 562 F.3d at 526 (quoting *Glenn*, 554 U.S. at 117) (internal quotation marks omitted). The standard of review, however, does not change from deferential to de novo. *See Glenn*, 554 U.S. at 115-16.

The focus of review is the "plan administrator's final, post-appeal decision." *Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011). In the course of its review, a court may consider prior decisions "as evidence of the decision-making process that yielded the final decision, and it may be that questionable aspects of or inconsistencies among those pre-final decisions will prove significant in determining whether a plan administrator abused its discretion." *Id.* (citing *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 855-56 (3d Cir. 2011)).

## III.   Discussion

### A.   MetLife's Denial of Reed's Continuing LTD Benefits Claim

Defendants argue that their decision to deny benefits was not an abuse of discretion and is supported by the evidence contained within the administrative record. Reed argues that MetLife

21

abused its discretion primarily in two ways.  First, he argues that the structural and procedural conflicts of interest in MetLife's decision-making constitute an abuse of discretion.  Second, he argues that MetLife's determination to deny his LTD benefits claim is not supported by substantial evidence.  The Court addresses these arguments below.

       1.   <u>Conflict of Interest</u>

At the outset, the Court notes that both parties agree that MetLife is a fiduciary with discretionary authority to determine Reed's eligibility for benefits under the Plan, and therefore the Court should apply the arbitrary and capricious standard to MetLife's decision to deny Reed's claim for ongoing LTD benefits after November 3, 2009.  Plaintiff, however, contends that this review must be conducted under heightened scrutiny because of Defendants' conflict of interest in this case.  Reed has raised several allegations with regard to Defendants' conflict of interest, both structural and procedural.  The Court turns towards these allegations now and addresses them separately and in the aggregate to determine whether a conflict exists that calls into question Defendants' fiduciary neutrality.

Plaintiff raises one[6] structural conflict of interest—that there is an "inherent conflict of interest due to the dual role of MetLife as both the insurer and administrator of the Citigroup disability plan . . . ." (Pl.'s Br. 21.)  Here, the parties agree that, based upon the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, MetLife has an inherent structural conflict as it is both the claim administrator and funder of plan benefits.  (*See* Defs.' Opp. Br. 16); *see also Glenn*, 554 U.S. at 112.  This factor, however, is "less important (perhaps to the vanishing point)" to this Court's analysis because evidence shows that MetLife took "active steps to reduce potential

---

[6] Plaintiff has also asserted that a structural conflict of interest exists based upon the "track record of MetLife and its reviewing physician, Dr. Howard Taylor."  (*See* Pl.'s Br. 22-23.)  The Court believes this argument is better characterized as a procedural conflict of interest and considers it as such.

bias and to promote accuracy." *See Glenn*, 554 U.S. at 117.  MetLife's practice is to adjudicate claims for LTD benefits based on the terms of the applicable Plan, and each claim is reviewed on its merits and based solely on the information in the claimant's file.  MetLife's finances are kept separate from claims, and its claims officers are geographically separate from its financial offices. Claims specialists do not report up to Financial Department employees, and Financial Department employees do not make, direct, or have any association with claim determinations.   Claim specialists receive no compensation, awards, bonuses, or other financial benefits or performance recognition based upon either the value or number of the claims they deny or terminate.  (*See* Hallford Cert. ¶¶ 4-6.)[7]  Reed has provided no evidence raising even an inference that the inherent conflict here actually influenced MetLife's decision in his case.  *See Smith v. FedEx Freight E., Inc.*, No. 08-1905, 2010 U.S. Dist. LEXIS 8080, at *16 (M.D. Pa. Feb. 1, 2010) (giving the administrator's conflict no special weight where the plaintiff "neglect[ed] to allege any evidence of [the administrator's] inherent conflict influencing the outcome beyond the fact that the outcome was not favorable to [the plaintiff]"); *Verme-Gibboney v. Hartford Life & Accident Ins. Co.*, No. 11-3796, 2014 U.S. Dist. LEXIS 33138, at *24-25 (D.N.J. Mar. 13, 2014) (concluding that the

---

[7] Plaintiff has moved to strike the Hallford Certification, asserting that the Court's review of the claim determination is limited to the administrative record and that Reed requested on two occasions "information and documents regarding [MetLife's] claims procedure."  (*See* ECF No. 34 at 1-2.)  The Third Circuit has made clear, however, that evidence beyond the administrative record may be considered in determining whether a structural conflict of interest exists.  *See Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793-94 (3d Cir. 2010).  As the Court has previously explained in this matter, "a district court may consider evidence beyond the administrative record as it relates to 'issues that were not before the plan administrator — such as trustee conflict of interest, bias, or a pattern of inconsistent benefits decisions.'"  *Reed v. Citigroup, Inc.*, 2014 U.S. Dist. LEXIS 66699, 7-8 (D.N.J. May 15, 2014) (quoting *Otto v. W. Pa. Teamsters & Emp'rs Pension Fund*, 127 F. App'x 17, 21 (3d Cir. 2005)).  Here, the Court considers the extra-record evidence because it is relevant to assessing the extent of MetLife's conflict of interest, "and by inference, the effect of that conflict on its decision-making process."  *Howley*, 625 F.3d at 794. Therefore, to the extent that Plaintiff is requesting the Court to strike the Hallford Certification in its "Objection," such motion is denied.

conflict of interest is "less important" to its analysis because the plaintiff pointed to no evidence that the conflict actually influenced the administrator's decision). Therefore, considering the steps MetLife has taken to reduce potential bias, the Court gives little weight to the inherent structural conflict of interest that exists here when reviewing MetLife's determination.

Next, Plaintiff raises several procedural conflicts of interest. First, Reed asserts that a conflict of interest exists here based upon the "track record" of MetLife and Dr. Taylor. The Court already addressed this issue when Plaintiff appealed the Honorable Douglas E. Arpert's, U.S.M.J., denial of Plaintiff's request to conduct extra-record discovery, and is constrained, pursuant to the law of the case doctrine, from reconsidering this holding. The Court does not find Plaintiff's arguments persuasive. Once again, Plaintiff has "failed to provide any evidence indicating that he himself was affected by some sort of procedural irregularity or bias" on the part of MetLife, and there is nothing novel in Plaintiff's briefs that raises a "reasonable suspicion of [Defendant's] misconduct." *See Reed*, 2014 U.S. Dist. LEXIS 66699, at *13-14 (internal quotation mark omitted). Likewise, Plaintiff's assertion that Dr. Taylor "was not a truly independent medical examiner," (Pl.'s Br. 22), is identical to his argument previously made to this Court. It, accordingly, is denied for the same reason: Plaintiff has failed to provide any evidence that Dr. Taylor was not acting independently in this case. Further, the Court once again notes that "courts in this District have found that mere evidence of payment to a doctor by an insurance company is insufficient to raise an inference of conflict or bias." *Reed*, 2014 U.S. Dist. LEXIS 66699, at *13 n.3 (citing *Conor v. Sedgwick Claims Mgmt. Servs.*, 796 F. Supp. 2d 568, 590 (D.N.J. 2011); *Zurawel v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson*, No. 07-5973, 2010 U.S. Dist. LEXIS 102085, at *34-35 (D.N.J. Sept. 27, 2010)). Without "proof of actual impropriety, such as reviewers receiving financial incentives to specifically deny or delay

claims, the mere fact that reviewers receive payment for their services is not enough to give rise to an inference of conflict." *Zurawel*, 2010 U.S. Dist. LEXIS 102085, at *34-35 (citation omitted).

Plaintiff also contends that Defendants' failure to order an Independent Medical Evaluation ("IME") or a vocational review as part of MetLife's review process constitutes a procedural irregularity. As Plaintiff concedes, pursuant to the Plan, MetLife has the option of conducting, but is not required to conduct, an IME on a claimant if it so chooses. (*See* Pl.'s Br. 24 ("We will have the right to have you examined at reasonable intervals by medical specialists of our choice.") (quoting ML 0146).) Plaintiff, however, asserts that a procedural irregularity exists because MetLife relied on the opinion of a consultant instead of ordering a physical examination. (*Id.*) It is well-established, however, that an administrator may rely on—and even choose to credit only— the opinions of doctors who perform a paper-only review, even if it conflicts with the views of a claimant's treating physician. *See, e.g.*, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (explaining that a plan administrator may also "credit reliable evidence that conflicts with a treating physician's evaluation"); *Bluman v. Plan Adm'r and Trs. for CNA's Integrated Disability Program*, 491 F. App'x 312, 316 (3d Cir. 2012) (rejecting plaintiff's argument that the administrator erred by relying on a doctor's opinion, when that doctor had only reviewed plaintiff's medical records); *Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004) (explaining that a plan administrator has no obligation to accord deference to treating physicians over other credible evidence, and that an insurer did not act arbitrarily by refusing to credit a report from claimant's treating physician); *Verme-Gibboney*, 2014 U.S. Dist. LEXIS 33138, at *19-20 ("A plan administrator may rely on the opinions of doctors who have reviewed a patient's medical records, but who have not physically examined the patient."); *Dolfi v. Disability Reinsurance Mgmt. Servs.*, 584 F. Supp. 2d 709, 735 (M.D. Pa. 2008) (holding that a plan administrator's

25

reliance on a doctor's report, when that doctor had done a paper-only review of the claimant's records, was not arbitrary).   Accordingly, it is not a procedural irregularity, nor is it arbitrary or capricious, that MetLife relied upon the reports of doctors who had conducted paper-only reviews.

Furthermore, because MetLife was under no obligation to seek an IME or a vocational review, it cannot be considered a procedural irregularity simply because it decided not to conduct one.   To find that MetLife had such an obligation to gather additional information or otherwise investigate Reed's claim goes against the terms of the Plan, which clearly place the burden of providing necessary information and documentation of Reed's disability on Reed himself.   *See, e.g.*, *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1163 (3d Cir. 1990).   Reed cannot shift this burden onto MetLife.   This is particularly true here, because, as discussed *infra*, Reed has failed to satisfy his burden of proving he suffers from a disability.   Because Reed did not establish a prima facie case, it is not a procedural irregularity—nor is it arbitrary or capricious—if a claim administrator did not conduct an IME or a vocational review.   *See, e.g.*, *Vega v. Cigna Grp. Ins.*, No. 06-5841, 2008 U.S. Dist. LEXIS 4648, at *20 (D.N.J. Jan. 23, 2008); *Feigenbaum v. Merrill Lynch & Co., Inc. Basic Long Term Disability Plan*, No. 06-1075, 2007 U.S. Dist. LEXIS 56360, at *16 n.11 (D.N.J. Aug. 2, 2007) (explaining that there is no ERISA requirement that an in-person evaluation be performed); *Morley v. Avaya, Inc.*, No. 04-409, 2006 U.S. Dist. LEXIS 53720, at *56-57 (D.N.J. Aug. 3, 2006); *see also Abnathya*, 2 F.3d at 47 (holding that, where a claimant failed to submit proof of continuing disability, a plan administrator was not specifically required to request an additional examination); *Gambino v. Arnouk*, 232 F. App'x 140, 146 n.2 (3d Cir. 2007) (explaining that a plan administrator was not obligated to inquire into the claimant's work-related activities where the claimant "had not provided sufficient evidence to establish disability").

Next, Reed asserts that a procedural irregularity exists because MetLife allegedly changed its claim determination without any new evidence. Specifically, Reed argues that MetLife reversed its position without any medical evidence of improvement in Reed's condition, and that "internal records reveal that the termination of Reed's benefits was based solely on its opinion that Reed 'should' have recovered from the effects of his injuries and should be able to return to work." (Pl.'s Br. 3, 26-29.)   MetLife, however, did not have the burden of establishing that Reed had "improved" in order to terminate his LTD benefits; rather, the terms of the Plan make clear that Reed had the burden of meeting certain conditions—including showing he continued to be disabled and was receiving the "Appropriate Care and Treatment"—in order to continue to receive benefits. (*See* ML 0126 (explaining that, to receive benefits under the Plan, a participant must submit proof of disability and evidence of continuing disability, as well as proof that the participant was under the "Appropriate Care and Treatment" of a doctor)); *see also Zurawel*, 2010 U.S. Dist. LEXIS 102085, at *54 ("Plaintiff bases a substantial part of his allegations on the premise that he has in fact established a prima facie case of disability that Defendants must then rebut. The burden of proof, however, rests with Plaintiff at all times.") (citing *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 439-40 (3d Cir. 1997)).   MetLife's determination that Reed failed to satisfy this burden and comply with the terms of the Plan based upon a lack of necessary medical proof does not constitute a reversal of a prior decision; it is, rather, part of MetLife's obligations as a fiduciary of the Plan, *see* 29 U.S.C. § 1104(a)(1)(D), and the consequence of Reed's own failure to follow the conditions of the Plan.   Accordingly, the administrative record makes clear that the basis of MetLife's claim determination was not the reversal of a prior decision or a belief that "Reed 'should' have recovered"[8]; rather it was the lack of documentation supporting Reed's continued disability or of

---

[8] While it is true that the claim termination letter states that Plaintiff's "initial diagnosis of coccydynia should have improved with conservative treatment and should no longer be precluding

Reed's continued receipt of "Appropriate Care and Treatment" as defined by the Plan. (*See* ML 0692-93.) The cases cited by Plaintiff, therefore, are inapposite—this is simply not the case where a plan administrator reversed its decision to award benefits without receiving any new medical information to support the change in position. (*See* Pl.'s Br. 27-29 (citing *Serbanic v. Harleysville Life Ins. Co.*, 325 F. App'x 86, 90-91 (3d Cir. 2009); *Hession v. Prudential Ins. Co. of Am.*, 307 F. App'x 650, 654 (3d Cir. 2008); *Post v. Hartford Ins. Co.*, 501 F.3d 154, 164-65 (3d Cir. 2007); *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000)).)

Stemming from this assertion is Plaintiff's claim that MetLife increased its scrutiny of Reed's claim for continuing LTD benefits after MetLife discovered Reed's compensation and eventually denied his claim "solely on financial considerations." (*See* Pl.'s Opp. Br. 3.) Plaintiff provides no support for this assertion, and a review of the entire administrative record offers no substantiation for this claim. Rather, the administrative record demonstrates that the investigation and eventual denial of Reed's claim was not precipitated by Citigroup advising MetLife that the earnings information Citigroup initially provided to MetLife was incorrect, but on MetLife's fiduciary obligations as set forth in the Plan and the diminishing documentation evidencing that Reed remained disabled or sought appropriate care or treatment as required under the Plan.

According to the administrative record, on February 10, 2009,[9] MetLife advised Reed that his claim would be denied as there was no documentation supporting medical treatment for disability subsequent to October 2008. (*See* ML 0922-25.) Plaintiff's claim was denied by

_____

you from returning to your occupation with brief position changes as needed," a review of the entire letter establishes that this was not the basis on which MetLife terminated Plaintiff's claim; rather, it adds support to MetLife's finding that, based on the submitted medical records and the report of Dr. McPhee, Plaintiff had failed to engage in treatment for his alleged disability.

[9] This date is notable because MetLife did not receive notification from Citigroup that Reed's salary should be $263,694 rather than $65,000 until March 6, 2009. (*See* ML 0255.)

correspondence dated March 13, 2009, because Reed had failed to submit medical documentation from October 2008 to the present. (*See* ML 0820-21.)  In response, Reed submitted the reports of Drs. Gu and Deschner.  Thereafter, Reed's claim for LTD benefits was reinstated effective March 14, 2009. (*See* ML 0812-13.)  During a telephone conversation on July 16, 2009, with MetLife's nurse consultant, Reed advised that he did not get the recommended MRI, x-rays, or otherwise follow up with Drs. Gu or Deschner; he relayed to the nurse consultant that he was now seeking physical therapy from Dr. Mulvaney. (*See* ML 0280-82.)  The nurse consultant concluded that if Reed did not continue treatment with Dr. Mulvaney, a physician's file review should be requested. (*See* ML 0282-83.)   MetLife then received records documenting Dr. Mulvaney's treatment recommendation, consisting of non-surgical spinal decompression and chiropractic physical therapy. (*See* ML 0767-68.)  Reed did not follow these recommendations.  Accordingly, on August 24, 2009, MetLife's nurse consultant recommended an independent physician review of Reed's medical record as she questioned whether Reed was receiving "Appropriate Care and Treatment" as there appeared to be explanation for his functional limitations or referrals to determine their causes. (*See* ML 0287-88.)  MetLife accordingly sought an independent physician review of Reed's entire file, which was performed by Dr. McPhee. (*See* ML 0751-58.)  Based on this report—which found that there was no medical support for Reed's claimed functional limitations and that Reed did not appear to be under the appropriate care and treatment of a physician—and the entire record, MetLife made the determination that Reed's claim should be denied.  The record contains no evidence that MetLife's investigation and determination is suggestive of any sort of procedural irregularity; rather, the record establishes that the determination was the result of a thorough and continuing investigation and analysis, which led to the conclusion Reed had failed

to provide medical records that either supported his alleged disability and corresponding restrictions, or established that he received the appropriate medical treatment and care.

Finally, Reed argues that MetLife's failure to consider the Social Security Administration's ("SSA") awarding of benefits to Reed shows a conflict of interest. As an initial matter, MetLife could not have considered the award of SSA benefits in its determination because Reed did not provide documentation of the award until after this litigation was commenced. (*See* Certification of Randi F. Knepper, Esq. ("Knepper Cert.") ¶ 2, Ex. 1.) Reed points to no evidence showing that he provided MetLife with any documentation evidencing that he was approved for SSA benefits until after this litigation was filed and years after the final claim determination; accordingly, the amount of pressure MetLife may or may not have placed on him to pursue benefits is irrelevant. Under the facts of this case, an award of SSA benefits is not relevant to the issue of bias because the award of benefits came after the final claim determination. It is axiomatic that MetLife could not have considered documentation that was not submitted prior to the final claim determination; consequently, there can be no procedural bias if MetLife did not consider documentation that was not submitted prior to the final claim determination. Accordingly, "the absence of any discussion of Plaintiff's SSA award by Defendants has no relevance in determining whether a conflict of interest exists." *Zurawel*, 2010 U.S. Dist. LEXIS 102085, at *36-37. Further, the Court notes that, while a reviewing court may consider the decision of the SSA as a factor in evaluating whether the denial of benefits is arbitrary and capricious, the "Social Security award does not in itself indicate that an administrator's decision was arbitrary and capricious, and a plan administrator is not bound by the SSA decision." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 269 (3d Cir. 2006). Therefore, Reed's receipt of SSA benefits after the final claim determination

is irrelevant to whether the claim determination here was arbitrary and capricious or whether a procedural conflict exists.

Having reviewed the totality of Reed's allegations of conflict—both procedural and structural—the Court fails to find evidence indicating that Defendants acted improperly.  None of the allegations suggest an overall scheme by Defendants to act disingenuously, and the record itself reveals no such scheme.  Plaintiff's complaints appear to be based instead on his overall disagreement with MetLife's decision to deny his claim for continuing LTD benefits.  The Court, however, will keep in mind the inherent structural conflict of interest on MetLife's behalf when reviewing its denial of benefits but notes that this conflict has little weight because of the steps MetLife has taken to reduce its bias.

### 2.   Denial of ERISA Benefits

To collect benefits under the Plan, a claimant must demonstrate that he or she is disabled, as that term is defined by the Plan.  An individual is "disabled" when:

> [D]ue to sickness, pregnancy, or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and
>
> 1.   During the Elimination Period you are Totally Disabled;
> 2.   After your Elimination Period, you are unable to earn more than 80% of your Predisability Earnings at your Own Occupation from any employer in your Local Economy.

(ML 0133.)  In addition to demonstrating a "disability," the claimant must also provide (1) proof of disability; (2) evidence of continuing disability; (3) proof that the claimant was under the "Appropriate Care and Treatment of a Doctor" throughout the time the claimant was disabled; (4) information about income benefits received from other sources; and (5) any other material information in order to receive LTD benefits under the Plan.  (*See* ML 0126.)  A failure to provide any of these items would lead to monthly benefits ending.  (*See* ML 0130.)  Thus, the Plan required

31

that Reed, in order to obtain LTD benefits, provide evidence of a continuing disability and "[p]roof that [he] was under the Appropriate Care and Treatment of a Doctor throughout [his] Disability." (*See* ML 0126, 0133.)  It is undisputed that Reed was disabled under the Plan and was qualified to receive benefits at the time he initially was approved for LTD benefits, effective July 10, 2008. (*See* ML 1118.)  However, Reed was required to provide MetLife with medical documentation evidencing his continued disability and treatment in order to continue to receive LTD benefits under the Plan.  MetLife's continuing review of Reed's medical records revealed that he was no longer disabled under the Plan on November 3, 2009.  (*See* ML 0692-94.)

When challenging the determination of an ERISA plan administrator, the plaintiff bears the burden of establishing that he is disabled under the plan and entitled to continuing benefits. *See Mitchell*, 113 F.3d at 439-40.  In determining whether the plaintiff has met his burden, courts must examine the record as a whole.  *Id.* at 440. The "record" consists of the evidence that was before the administrator at the time benefits were denied.  *Id.*  Because MetLife has the fiduciary discretion to determine whether a disability exists, its decision to discontinue Reed's LTD benefits must be upheld unless a review of the record shows the decision to be arbitrary or capricious.

The administrative record demonstrates that Reed submitted no documentation evidencing either that a physician concluded that he was disabled at the time his claim was initially denied or that Reed was under the "Appropriate Care and Treatment of a Doctor."  While both Dr. Deschner and Dr. Gu assessed Reed's condition, Reed did not obtain the recommended MRI, did not follow-up with Dr. Deschner despite being scheduled to return to see him, and did not continue treatment with Dr. Gu beyond the single appointment.  Both Drs. Deschner and Gu believed injection therapy would alleviate Reed's pain, but Reed failed to return to see either doctor or to suggest any other viable treatment plan.  When Dr. Taylor was reviewing Reed's medical documents, he reached out

32

to Dr. Gu in order to ascertain whether Reed had any restrictions or limitations when Dr. Gu saw Reed, but Dr. Gu had no opinion concerning Reed's functional limitations. (*See* ML 0546.) Although Dr. Mulvaney, a chiropractor, opined that Reed had significant restrictions and limitations, he expected improvement "in 4 to 8 weeks of treatment." (*See* ML 0767.)  Reed, however, did not follow through with any of the treatments recommended by Dr. Mulvaney. Further, Dr. Mulvaney examined Reed only once and never treated him; the other three times Reed came in to Dr. Mulvaney's office it was "basically to discuss his case." (ML 0756.)

Because of the lack of documentation indicating that Reed was pursuing any treatment plan, MetLife obtained an independent medical review of Reed's entire file by Dr. McPhee. Dr. McPhee concluded that Reed's symptoms should have improved, that there was no support for cauda equina syndrome or radiculopathy, and that Reed was not under the appropriate care and treatment of a physician. Dr. McPhee noted that Reed was not taking prescription medicine, did not attend physical therapy, and did not follow through on any of the recommendations by any specialist or chiropractor. She concluded that, based on Reed's imaging studies and the limited findings on clinical examination, Reed should be able to perform a sedentary level of activity, the level of activity required by his occupation as a financial advisor. (*See* ML 0757-58.)

On appeal, Reed submitted correspondence from Dr. Adams, which supported the existence of Reed's restrictions and limitations. Reed, however, only sought treatment from Dr. Adams on one occasion, and she advised Dr. Taylor that her opinions were based solely upon what Reed told her, that she did not review any of his records, and that she "did not feel qualified to determine if he is able to work." (ML 0545-46.) Dr. Adams also noted that she encouraged Reed to proceed with injection therapy. On or about July 8, 2010, Dr. Stern found that there was not "sufficient evidence of disability at this time for [him] to agree to certify [Reed] as being disabled

33

without objective evidence of disability." (ML 0525.) Mr. Skorupa, a physical therapist, opined that Reed was "disabled from gainful competitive activity at any physical demand" but did not perform a functional capacity evaluation or any other objective testing on Reed. (ML 0590.)

Dr. Taylor conducted an independent medical review and found that there was "no clinical evidence to support restrictions and limitations and/or side effects resulting from medication beyond 11/3/2009." (ML 0548-49.) He also noted that the MRI did not support bladder or bowel incontinence, was not consistent with cauda equina syndrome, did not support radicular type pain or pain localized to the coccyx area, and was "not consistent with permanent impairment." (ML 0548.) When Dr. Stern reviewed the MRI, he largely echoed these findings. (*See* ML 0525.) Dr. Taylor also noted that Reed had been to see physicians after November 11, 2009, but the medical records showed that he had not been for treatment. (*See* ML 0548-49.) Dr. Taylor also concluded that Mr. Skorupa could not assess Reed's capability of performing gainful competitive activity without actually performing any testing. (*See id.*) After MetLife requested Dr. Taylor to review additional records submitted by Reed, he issued an addendum report in which he concluded that his original medical opinion did not change, because there "is no medical evidence now and there has not been medical evidence to support Mr. Reed's complaints." (ML 0516.) MetLife also sought and obtained an independent medical review from Dr. Bellinger, who concluded that functional limitations were not supported from a cardiovascular standpoint. (*See* ML 0552-53.)

After Reed's termination of benefits was upheld on appeal, Reed submitted additional documents. Dr. Taylor, after reviewing these additional records, issued a second addendum report. While Dr. Stern had stated in new correspondence that Reed was not "medically capable of being gainfully employed as a stock broker," (ML 0462), Dr. Taylor concluded that there was no support in Reed's medical records for Dr. Stern to change his opinion and that Dr. Stern had provided no

basis for the change in his opinion. Dr. Taylor noted that the medical examinations conducted by Drs. Sheikh and Stern were significantly different, and there was no medical support for what might have changed Reed's condition. He also noted that Mr. Skorupa's correspondence, which relied upon the MRI studies for his conclusion that Reed could work in a sedentary position, was at odds with Dr. Stern's previous opinions and with the MRI itself. Overall, Dr. Taylor concluded that the additional medical documentation did not alter his original determination. Dr. Bellinger, on his review of the additional records, likewise concluded that the records did not change his general opinion. (*See* ML 0440-41.)

Accordingly, MetLife's determination that Reed was no longer disabled under the Plan as of November 3, 2009, is neither arbitrary nor capricious. A review of the record as a whole reveals substantial evidence to support MetLife's decision to terminate Reed's claim for LTD benefits, including six independent medical reviews and the lack of medical documentation, clinical examinations, or test results supporting Reed's disability as defined by the Plan—including receiving the required "Appropriate Care and Treatment" during the course of his disability. It is clear that MetLife considered the entire administrative record, including all of the medical evidence submitted by Reed, his affidavits, and the reports of the consulting physicians, and made a determination, which is clearly supported by substantial evidence, that the medical evidence did not support physical restrictions and limitations from the type of sedentary work that Reed's occupation entailed.

Here, MetLife chose to rely upon the opinions of the consulting physicians, which it is justified in doing. *See, e.g., Nichols v. Verizon Commc'ns, Inc.*, 78 F. App'x 209, 211-12 (3d Cir. 2003) ("[A plan administrator] is therefore justified in placing reliance on the opinions of its own consulting doctors and need not provide a special explanation of its decision to do so.") (citing

*Black & Decker Disability Plan*, 538 U.S. at 834)).  The reports of the consulting physicians all emphasized the dearth of treatment Reed had undergone and found that the objective medical evidence provided by Reed did not establish that Reed was disabled.[10]  While Plaintiff points to the findings of Drs. Gu, Stern, Buck, Shaw, and the results of the IME examination by Dr. Lipschultz, these records were considered by MetLife,[11] and MetLife gave more credit to the reports of its consulting physicians.  MetLife's reliance on its consulting physicians—who had the ability to review Reed's entire medical record—is even more reasonable here, where there is a noticeable lack of information submitted by Reed's treating physicians, and none of his treating physicians treated him for an extended period of time.  Contrary to Plaintiff's assertions, the Court finds nothing suspicious or inaccurate in Dr. Taylor's reports, and Plaintiff does not even question the reports of Drs. McPhee or Bellinger.  Under the substantial evidence standard, it is irrelevant if there is evidence that may indicate that Reed was disabled; the Court's duty is not to determine what resolution it would reach on a de novo review of the administrative record, but to simply determine if there is substantial evidence to support the determination of MetLife.[12]  This standard has been met here.

---

[10] Plaintiff argues that there is no evidence that the treating physicians, and in particular Dr. Taylor, considered his job duties or the requirements of a financial advisor.  As noted earlier, a plan administrator does not need to inquire into the claimant's work-related activities where a claimant "had not provided sufficient evidence to establish disability."  *Gambino*, 232 F. App'x at 146 n.2. Furthermore, here, MetLife determined that Reed had no restrictions or limitations and therefore was capable of "performing full-time work beyond November 3, 2009." (*See* ML 0692.)

[11] Reed asserts that MetLife did not consider some of these medical records; however, there is no evidence that MetLife did not consider these records.  Rather, MetLife did consider the records, but found the evidence to not be persuasive, in large part because it did not relate to the relevant timeframe. (*See* ML 0386-88.)

[12] Contrary to Plaintiff's assertions, Dr. Buck never "found Reed to be totally disabled." (ML 0456-57.) Dr. Buck did state that Reed had L5-S1 radiculopathy and that his exam was consistent with cauda equina syndrome.  Dr. Buck stated that Reed did have functional limitations, but gave no explanation for what he believed the limitations were or whether they precluded Reed from

Reed asserts that he supplied "substantial evidence" of his disability from his treating physicians. (*See* Pl.'s Br. 17.) Reed, however, uses the term "treating" lightly—the majority of the physicians that supplied medical documentation for Reed were only seen once by Reed; specifically, he only sought consultation from Drs. Deschner, Gu, Adams, Mulvaney, Shah, and Buck once. While Reed has submitted an affidavit indicating that he could not undergo any treatment until an insurance dispute was worked out, Reed offers no reason why he failed to engage in treatment or consistent care of any kind after the dispute was worked out in May 2009. During the course of Reed's alleged disability, treatment or follow-up was suggested, but the medical record lacks evidence indicating that Reed followed any such suggestion from any of the physicians he saw. Reed did not follow-up or obtain additional diagnostic testing as recommended by Dr. Cervantes; he did not undergo an MRI, x-rays, or follow-up with Dr. Deschner as recommended by Dr. Gu; he did not undergo non-surgical spinal decompression or physical therapy as recommended by Dr. Mulvaney; he did not receive a functional capacity evaluation as recommended by Dr. Stern[13]; and he never underwent any sort of injection therapy despite

working his sedentary job. Dr. Buck also examined Plaintiff for the first time on February 1, 2011—15 months after the relevant time period—and found him to have a reduction in his ability to work as of July 1, 2009, a time when Reed was receiving LTD benefits. Significantly, Dr. Buck concluded that Reed "was not receiving appropriate treatment," a Plan requirement. (*See id.*) Dr. Lipschultz emphasized that the cauda equina syndrome was not confirmed. Dr. Lipschultz, like Dr. Gu, offered no opinion as to whether Reed was disabled or if he had restrictions or limitations. While it is true that Dr. Shaw concluded that Reed was disabled on March 30, 2011, his letter was submitted after the final claim determination and provides no information as to whether Reed was disabled on or around November 3, 2009, when his claim for benefits was denied. Rather, Dr. Shaw concluded that Reed was disabled as of November 30, 2011—16 months after the relevant time period. Further, Dr. Shah failed to document any treatment that was recommended as Dr. Shah's analysis was limited to considering Reed's restrictions. Finally, Dr. Stern's change of opinion that Reed was disabled was contradicted by his prior opinion, and he provided no basis for this change of opinion.

[13] Mr. Skorupa was retained to perform the functional capacity evaluation but never performed the evaluation; instead, he opined that Reed was disabled.

numerous doctors recommending such a procedure for his pain.  Based upon the absence of treatment or follow-up, multiple "treating" physicians stated that they were not qualified to determine if Reed was disabled.  (*See* ML 0851 (statement of Dr. Subbiah); ML 0545 (statement of Dr. Adams); ML 0546 (statement of Dr. Gu).)  Indeed, a review of the record fails to establish that Reed ever underwent any sort of treatment to help alleviate his pain, a clear condition of receiving benefits under the Plan.  Considering this major defect, the Court cannot find that MetLife's determination was arbitrary and capricious; nor can it find that Plaintiff demonstrated that he was disabled as defined by the Plan or under the "Appropriate Care and Treatment" of a doctor at or around the time his claim for continuing LTD benefits was denied.[14]

Finally, Reed asserts that MetLife's determination was arbitrary and capricious because MetLife "failed to consider his subjective complaints of pain." (Pl.'s Br. 35.)  This assertion lacks merit.  Reed's complaints were considered by both Dr. Taylor and MetLife, both of which found that Reed's complaints of pain were not supported by the objective evidence.  Dr. Taylor's first

---

[14] Contrary to Plaintiff's assertions, this is not a "new ground" on which to justify the termination of Plaintiff's LTD benefit.  The definition of disability under the Plan requires that a claimant is receiving "Appropriate Care and Treatment from a Doctor on a continuing basis." (ML 0133.)  Accordingly, to be disabled under the Plan, Reed had to provide evidence of such treatment and care.  (*See* ML 0126.)  In its November 3, 2009 termination correspondence, MetLife made clear that its decision was based on the lack of documentation concerning Reed's current level of functioning and treatment.  (*See* ML 0693.)  Accordingly, Reed had failed to establish he was "disabled" under the terms of the Plan. (*See* ML 0692.)  Likewise, the January 21, 2011 correspondence from MetLife, in which MetLife denied Reed's appeal and upheld the original determination terminating Reed's LTD benefits, clearly stated that MetLife was upholding the finding that "the medical information no longer supports total disability, per the requirements of the Plan." (ML 0473.)  The body of the correspondence also notes that the medical records submitted by Reed indicated a lack of treatment.  (*See* ML 0475.)  Accordingly, MetLife's assertion that Reed was not under the "Appropriate Care and Treatment of a Doctor" is not a new basis that MetLife is asserting during this litigation; rather, it is clearly a major part of the reason that MetLife terminated Plaintiff's LTD benefits.  *Compare Skretvedt v. E.I. Du Pont de Nemours & Co.*, 268 F.3d 167, 177 (3d Cir. 2001) (finding justifications by Plan administrator to be "post hoc because they never were offered to [claimant] following the denial of his initial claim or his appeal," but addressing such justifications anyway).

38

addendum report shows that he considered and addressed Plaintiff's subjective complaints but found that his complaints were not valid based upon the objective medical evidence.  It is not arbitrary and capricious for a medical reviewer to not credit a claimant's subjective complaints where the objective evidence does not support the extent of such complaints.  *See Zurawel*, 2010 U.S. Dist. LEXIS 102085, at *51-52 (citing *Dolfi*, 584 F.Supp. 2d at 735 (medical consultants' findings that the plaintiff's subjective complaints of pain are inconsistent with the objective evidence available is not arbitrary and capricious)); *see also Nichols*, 78 F. App'x at 212 (finding that it was not arbitrary and capricious for a claim administrator to require objective evidence of symptoms).  Accordingly, it was not arbitrary and capricious for MetLife to credit the conclusions of Dr. Taylor over the subjective complaints of Reed.

At its core, the majority of Plaintiff's complaints stem from his feeling that nothing in his condition changed, yet his benefits were terminated.  That lack of change, however, was the very problem—under the terms of the Plan, Reed had an obligation to remain under the appropriate care and treatment of a physician during the course of his disability.  Plaintiff never underwent any sort of treatment and failed to take subsequent steps to any of the suggestive treatment or plans prescribed by a physician during the time following his injury.  He failed to follow up with any of the doctors he saw; indeed, the majority of the time he never returned to see a "treating" doctor after an initial consultation.  At the time his claim was initially denied, only Dr. Mulvaney, a chiropractor who never treated Plaintiff, opined that he was disabled, and many of his physicians' opinions on appeal were contradicted by their prior opinions and subsequent statements.  Plaintiff never submitted a vocational review, but rather submitted a report from Mr. Skorupa, who never actually performed the functional capacity evaluation he was engaged to perform.  The consulting doctors reviewed Reed's entire file and found Reed had failed to establish that he was disabled

under the terms of the Plan.   Accordingly, there was adequate evidence that might cause a reasonable person to agree with the denial of benefits, and summary judgment will be entered in favor of Defendants.   *See Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000).

**B.      Plaintiff's Claim for Breach of Fiduciary Duty**

In addition to seeking LTD benefits, Reed asserts a cause of action based upon a breach of fiduciary duty and seeks an "Order making Reed whole for damages due to Defendants' breach of fiduciary duty."   (*See* Compl. Addendum Clause, ¶ D.)   In his Complaint, Reed alleges that MetLife breached its fiduciary duty by not appropriately justifying its decision to terminate Reed's LTD benefits, by "cherry pick[ing]" Reed's file, by not having Reed examined by a physician, and by failing to provide Reed with the proper information for perfecting his claim.

First, as a threshold matter, a review of the Complaint makes clear that Plaintiff is attempting to repackage his denial of benefits claim as a breach of fiduciary duty claim; in essence, he is alleging that Defendants violated ERISA when MetLife denied his claim and that he is accordingly entitled to benefits under the Plan. (*See, e.g.*, Compl. ¶¶ 40, 42.)   Under Third Circuit law, a "claim for breach of fiduciary duty is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of an ERISA-regulated plan rather than an interpretation and application of ERISA."   *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 254 (3d Cir. 2002) (internal quotation marks omitted).   Here, the allegations that form the basis of Plaintiff's breach of fiduciary duty claim rely upon an interpretation of the Plan, as opposed to an interpretation of ERISA itself.   *See also Cooper v. Alliance Oral Surgery, LLC*, No. 13-1126, 2013 U.S. Dist. LEXIS 151655, at *10-11 (D.N.J. Oct. 18, 2013) (entering summary judgment for defendant on breach of fiduciary duty claim where plaintiff did "not allege any injury under the ERISA-related claims independent of the denial of plan benefits," because the claim for breach of

fiduciary duty "constitutes a recasting of a claim for benefits"). Accordingly, because the allegations that make up Plaintiff's claim for breach of fiduciary duty indicate that Plaintiff's underlying claim is actually one for Plan benefits arising under § 1132(a)(1)(B), Plaintiff's claim for breach of fiduciary duty is not viable as a matter of law.

Further, Plaintiff is seeking monetary damages for Defendants' alleged breach of fiduciary duties. To the extent that Plaintiff is bringing these claims pursuant to the enforcement section of ERISA, Section 502(a), for a breach of fiduciary duty under Section 409, such a claim must fail. It is well established that a plaintiff cannot state a claim for monetary damages for breach of fiduciary duty under ERISA "absent a 'loss to the plan' as opposed to a loss suffered by individual beneficiaries or a subclass of beneficiaries." *Fox v. Herzog Heine Geduld, Inc.*, 232 F. App'x 104, 105 (3d Cir. 2007) (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985)); *see also Hein v. FDIC*, 88 F.3d 210, 222-23 (3d Cir. 1996) ("The Supreme Court has held that Congress intended any extracontractual damages sought by a plan participant pursuant to § 409 to inure to the plan itself, and not to an individual plan beneficiary."). Accordingly, here, because Plaintiff seeks to recover benefits allegedly owed to him in his individual capacity, his action is plainly not authorized by either Section 409 or Section 502(a)(2).[15]

Finally, Plaintiff has failed to establish that Defendants actually breached any fiduciary duty. Plaintiff, citing to *Bixler*, argues that Defendants breached their fiduciary duty when they

---

[15] Because Plaintiff is seeking damages, and not equitable relief, his claim is not proceeding under Section 502(a)(3). *See* 29 U.S.C. § 1132(a)(3); *see also Pell v. E. I. DuPont De Nemours & Co.*, 539 F.3d 292, 306 (3d Cir. 2008). Even if Plaintiff was proceeding under Section 502(a)(3), he has failed to allege or otherwise argue that he is seeking any form of "appropriate equitable relief . . . to redress any act or practice which violates any provision of this title." *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1298 (3d Cir. 1993) (internal quotation marks and emphasis omitted); *see also Cigna Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011) (explaining that "appropriate equitable relief" under Section 502(a)(3) refers to "those categories of relief that traditionally speaking (i.e., prior to the merger of law and equity) were typically available in equity").

failed to provide certain requested claim information to Plaintiff.  (*See* Pl.'s Br. 31-34 (quoting

*Bixler*, 12 F.3d at 1300, 1301).)  Plaintiff asserts that Defendants (1) failed to provide "adequate

information regarding the reasons for the termination of his benefits and failed to provide Reed

with proper information regarding perfecting of his claim [sic]" (*id.* at 34); and (2) MetLife failed

to "provide copies of retainer agreements for all persons chosen to conduct a review of Reed's

disability benefits and documentation of other disability benefits claims decided by such persons

for MetLife" (*id.* at 33).  Neither of these grounds support a finding of a breach of fiduciary duty.

      First, MetLife's adverse determination letter clearly satisfies the statutory and regulatory

requirements of ERISA.  Pursuant to regulations established by the Secretary of Labor, written

notices of denial of a claim must include:

> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

*Syed v. Hercules Inc.*, 214 F.3d 155, 162 (3d Cir. 2000) (quoting 29 C.F.R. § 2560.503-1(f)).  The

adverse determination letter must also provide a "description of any additional material or

information necessary for the claimant to perfect the claim and an explanation of why such material

or information is necessary."  29 C.F.R. § 2560.503-1(g)(iii).

      Plaintiff's adverse determination letter sets forth the basis for the claim determination and

the pertinent Plan provision on which denial was based.  (*See* ML 0692-93 (explaining that denial

was based on Plaintiff's failure to provide documentation regarding level of functionality or

treatment, and that there was no medical evidence to support Plaintiff's claim that he could no

42

longer perform his "sedentary level occupation as a Financial Advisor").)    The adverse determination letter also described the material or information necessary for Reed to perfect his claim:

> We will review any additional information you care to submit including but not limited to:  All lab reports, office notes and tests completed by any of your treating Physicians for the period of July 2009 to October 22, 2009.
>
> . . . Please include in your appeal the reason(s) you believe the claim was improperly denied, and submit the previously requested information as well as any additional comments, documents, records and other information relating to your claim that you deem appropriate for us to give your appeal consideration.

(ML 0693.)  Plaintiff was provided with the reasons for his claim denial and what documentation and steps were necessary to perfect his claim.  MetLife, accordingly, could not be found liable for any breach of a fiduciary duty premised in its alleged failure to provide Reed with adequate information regarding the reasons for the termination of his benefits or with proper information regarding perfecting his claim.

Likewise, Plaintiff's assertion that MetLife breached a fiduciary duty by refusing to "provide copies of retainer agreements for all persons chosen to conduct a review of Reed's disability benefits and documentation of other disability benefits claims decided by such persons for MetLife" is meritless.  (*See* Pl.'s Br. 33.)  Plaintiff's reliance on *Bixler* for this assertion is misguided; *Bixler* concerned a fiduciary's responsibility under ERISA "to disclose material information" and illustrated that ERISA forbids a fiduciary from affirmatively misleading or making material omissions to a plan participant or beneficiary regarding coverage or specific terms of a plan. *See Bixler*, 12 F.3d at 1300-01.  Here, Plaintiff is asserting that Defendants breached a fiduciary duty to him when they failed to provide documentation relating to an alleged conflict of interest.  Not only did MetLife not have a legal obligation to produce this requested documentation under either Third Circuit precedent or the terms of the Plan, the Court previously denied Plaintiff's

43

requests for this documentation during the course of litigation as the information was irrelevant. (*See, e.g.*, ECF Nos. 29, 30, 44.) Accordingly, even if the Court was to assume that Plaintiff could bring a breach of fiduciary duty claim, Plaintiff has failed to establish that Defendants had breached any alleged duty, as Defendants provided all the information they were required to provide under the applicable regulations and law.[16] Therefore, summary judgment is entered for Defendants on Count II.

### C.   Equitable Estoppel and Waiver Claims

In Counts III and IV of his Complaint, Plaintiff brings claims for waiver and equitable estoppel. These claims are premised upon MetLife's approval of Reed's LTD benefits through 2031 on March 23, 2009.[17] Reed asserts that, based on this representation, MetLife should be equitably estopped from terminating his LTD benefits prior to 2031. Likewise, Reed claims that, by approving Reed's LTD benefits, MetLife "waived [its] right to disapprove its decision to grant Reed's long-term disability benefits." (Compl. ¶ 48; *see also* Pl.'s Br. 43.) Defendants argue, however, that the terms of the Plan mandate that Reed was obligated to provide proof of a continuing disability and that he was under the care and treatment of a doctor to remain eligible for benefits; his failure to do so, they assert, is the reason his claim was eventually denied. Because Plaintiff's argument is contrary to the terms of the Plan and to correspondence sent to Reed by MetLife, summary judgment must be entered in favor of Defendants on these claims.

---

[16] Plaintiff also argues that "'noncompliance' with ERISA's notice requirements 'weighs in favor of finding that decision was arbitrary and capricious.'" *Morningred*, 526 F. App'x at 220 (quoting *Miller*, 632 F.3d at 852-53). Because the Court finds that MetLife did comply with ERISA's notice requirements, it does not factor into the Court's determination of whether MetLife's decision was arbitrary and capricious.

[17] In his Complaint, Reed alleges that he was approved for LTD benefits on April 9, 2008; however, in moving for summary judgment on his equitable estoppel claim, Reed relies upon a March 23, 2009 claim update on his online account with MetLife.

1.   <u>Equitable Estoppel</u>

A judgment for Reed on his equitable estoppel claim would require the Court to find "(1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 236 (3d Cir. 1994) (citing *Smith v. Hartford Ins. Grp.*, 6 F.3d 131, 137 (3d Cir. 1993)). "A party's reliance on a misrepresentation 'must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.'" *Hein*, 88 F.3d at 221 (quoting *Heckler v. Cmty. Health Serv.*, 467 U.S. 51, 59 (1984)). A finding of "'extraordinary circumstances' generally involves acts of bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud." *Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1011 (3d Cir. 1997).

Reed claims that he satisfies all three elements for equitable estoppel. First, he identifies an alleged misrepresentation. Reed claims that, on March 23, 2009, he observed on his online account with MetLife that his LTD benefits had been approved through October 30, 2031, the date of his 65th birthday. (*See* Declaration of Frank Reed ("Reed Decl.") ¶¶ 4, 6, Ex. B.) He also claims that, after requesting plan information and documentation from MetLife, he was emailed a "Managed Disability" brochure from Citigroup on September 22, 2009. This brochure provides, in relevant part, that MetLife will continue to manage the claim of an individual who has been approved for LTD benefits and that said benefits will be paid monthly through MetLife. (*See id.*; Ex. C at 7.) The brochure also contains a chart indicating that, based on when Reed's LTD benefits began, his benefits would end on his 65th birthday. (*See id.* at 10.) Reed next claims that, in reliance on Defendants' representations, he moved his family to Virginia, purchased a home there, and undertook extensive renovation of the home. Reed asserts he "spent through [his] savings and

cash reserves to accomplish the move, the purchase, and to initiate the restoration and renovation work." (Reed Decl. ¶ 12.) When his LTD benefits were terminated on November 3, 2009, he claims he was no longer able to "afford the payments for the Virginia home, and could not complete the renovation work. [He and his family] were forced to leave the Virginia home, which was lost to foreclosure." (*Id.* ¶ 14.)

The plain language of the Plan, however, precludes Reed's claim. As discussed in detail, the Plan does not bestow upon Reed an unconditional entitlement to LTD benefits once he was approved for LTD benefits. Rather, Reed had to provide (1) proof of disability; (2) evidence of continuing disability; (3) proof that he was under the "Appropriate Care and Treatment of a Doctor" throughout the time he was disabled; (4) information about income benefits received from other sources; and (5) any other material information in order to receive LTD benefits under the Plan. (*See* ML 0126.) The Plan clearly states that benefits awarded under the Plan will end on the date that the claimant failed to provide MetLife with any of the aforementioned information. (ML 0130.) To find that Reed was somehow guaranteed benefits pursuant to the Plan for twenty-three years without the need to provide proof of disability would be contrary to the plain language of the Plan. *See Hein*, 88 F.3d at 222. Further, the very brochure that Reed relies upon in asserting he was unconditionally guaranteed benefits explicitly states that, "MetLife will continue to manage your claim, **according to plan provisions** . . . ." (Reed Decl., Ex. B, at 7 (emphasis added).) Finally, Plaintiff has submitted evidence of a computer "screen shot" of the claim history page from his MetLife online account that indicates that his benefit claim had been approved through October 30, 2031. (*See* Reed Decl., Ex. B.) The actual correspondence sent to Reed, however, clearly states that, in order to continue receiving benefits, "you must be disabled as defined by the plan" and that monthly benefits will end on "the date you are no longer disabled" or "the date you

fail to provide us with any of the information listed in the Plan Highlights under Benefit Checklist."
(ML 0812-13.)

In the face of such clear evidence that Reed's entitlement to LTD benefits was conditioned
on both remaining "disabled" under the terms of the Plan and continuing to provide MetLife with
the aforementioned required documentation, the claim update that Reed observed on his online
MetLife account upon which Plaintiff purports to have relied is insufficient for his estoppel claim.
It is well-established that the written terms of an ERISA plan control and cannot be informally
amended or modified in a way that changes the written document. *See, e.g.*, *Confer v. Custom
Eng'g Co.*, 952 F.2d 41, 43 (3d Cir. 1991); *see also In re Unisys Corp. Retiree Med. Benefit
"ERISA" Litig.*, 58 F.3d 896, 907-08 (3d Cir. 1995) (explaining that, while the claimants may have
relied on their interpretation of a summary plan description, their interpretation was contrary to the
"unambiguous" language of the plan documents and therefore was unreasonable). ERISA plan
participants have a duty to inform themselves of the details provided in their plan, *Jordan*, 116
F.3d at 1016, and "a participant's reliance on employer representations regarding benefits may
never be 'reasonable' where the participant is in possession of a written document notifying him
of the conditional nature of such benefits." *In re Unisys*, 58 F.3d at 908. If the language of the
plan is clear, reasonable reliance cannot be established on a contrary interpretation even if the
company had "engaged in a 'systematic campaign of confusion' which led employees to believe"
that their interpretation of the plan was correct. *Id.* at 907 n.20.

Here, the Plan is absolutely clear that the availability of benefits depends on a claimant's
ongoing disability, proof of said disability, and documentation showing that the claimant is under
the appropriate care and treatment of a physician. (*See* ML 0126.) Further, it is notable that, rather
than engaging in a "systematic campaign of confusion," MetLife consistently communicated with

Reed that his receipt of benefits was contingent on the conditions set forth in the Plan. The record clearly establishes that MetLife continuously sought documentation supporting his claim for disability benefits under the Plan. (*See, e.g.*, ML 0820 (March 13, 2009 letter terminating benefits because Reed failed to provide certain medical/treatment records and an attending physician statement); ML 0840, 0935 (February 12, 2009 letter stating that Plaintiff's claim will be closed unless he provides certain documentation necessary to complete a claim determination).) Accordingly, Reed could not have reasonably relied upon the claim update on his online MetLife account or the brochure as evidence of continuing, unconditional LTD benefits for twenty-three years in the face of the clear language of the Plan.

This also highlights the readily apparent absence in the record before the Court of the presence of extraordinary circumstances. In order to establish "extraordinary circumstances," Reed would have had to establish MetLife acted in bad faith, or "attempt[ed] to actively conceal a significant change in the plan, or comm[itted] fraud." *Burstein v. Ret. Account Plan for Emps. of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 383 (3d Cir. 2003). Contrary to Plaintiff's assertions, there is absolutely no evidence that MetLife acted in bad faith. The basis of Reed's claim is that he observed a claim update on his online MetLife account that indicated he would receive LTD benefits until 2031, but the complete letter sent to Plaintiff on March 23, 2009, clearly states that Reed's continued receipt of LTD benefits was conditioned on him remaining "disabled" under the Plan and continuing to provide the relevant and necessary documentation. Accordingly, Plaintiff's claim for relief under a theory of equitable estoppel must fail, and summary judgment will be entered in favor of Defendants.

2.     Waiver

A waiver claim "requires that the asserting party show that the opponent intentionally relinquished or abandoned 'a known right or privilege.'"  *Stallings v. IBM Corp.*, No. 08-3121, 2009 U.S. Dist. LEXIS 81963, at *17 (D.N.J. Sept. 8, 2009) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  While the Third Circuit has yet to address the applicability of a waiver claim in the context of an ERISA case, "[t]he consistent trend among the district courts is to refuse to apply waiver in ERISA cases where it would expand the scope of coverage under the ERISA plan to an otherwise ineligible participant."  *Funicelli v. Sun Life Fin. (US) Servs. Co.*, No. 12-06659, 2014 U.S. Dist. LEXIS 4601, at *29 (D.N.J. Jan. 14, 2014).

Here, if the Court were to enter judgment in favor of Plaintiff under the theory of waiver, it would expand the scope of coverage under the Plan beyond what was otherwise permitted by the Plan language.  The Plan is clear that LTD benefits eligibility is contingent on a claimant providing MetLife with the information listed in the Benefits Checklist in the Plan Highlights section of the Plan.  (*See* ML 0030.)   To find that MetLife waived its right to terminate Reed's LTD benefits[18] for failing to provide proof of "disability" under the Plan is clearly contrary to the Plan's language and would expand coverage beyond the provisions of the Plan.  *See, e.g., Funicelli*, 2014 U.S. Dist. LEXIS 4601, at *30-31 (refusing to apply waiver where it would create coverage under the plan that would not have otherwise been permitted by the language of the plan); *Viera v. Life Ins. Co. of N. Am.*, No. 09-3574, 2010 U.S. Dist. LEXIS 34529, at *36-38 (E.D. Pa. Apr. 6, 2010) (declining to apply waiver where adopting the plaintiff's waiver argument "would expand

---

[18] In his moving papers, Plaintiff asserts that Defendants have also waived their right to "insist on further administrative review or assert a new ground for termination . . . ." (Pl.'s Br. 44.)  MetLife, however, has not insisted on "further administrative review," and the Court has already found that MetLife did not assert a "new ground" for terminating Reed's LTD benefits in this action.  *See supra* n.14.

the coverage of the [plan] to allow an otherwise ineligible participant to receive a benefit under the applicable plan"); *Pergosky v. Life Ins. Co. of N. Am.*, No. 01-4059, 2003 U.S. Dist. LEXIS 4460, at *17-20 (E.D. Pa. Mar. 24, 2003) (denying a waiver claim, "despite Defendants' mistake and continued receipt of Plaintiff's premiums for more than ten years," because allowing waiver would work to rewrite the terms of the plan by covering something the plan clearly excluded).  An online claim update that is contrary to the Plan's explicit language, the March 23, 2009 letter from MetLife, and the brochure that Plaintiff relies upon (which explicitly provides that benefits will continue pursuant to the plan provisions) cannot serve as the impetus for MetLife waiving its rights under the terms of the Plan.

There is also no evidence indicating that MetLife intentionally forfeited its rights under the Plan to terminate a LTD benefits claim if the claimant failed to abide by the terms of the Plan. MetLife continually requested—and Reed continually provided—documentation supporting his LTD benefits claim.  Indeed, Plaintiff was sent correspondence dated March 23, 2009, which indicated that his LTD benefits approval was contingent on his continued compliance with the terms of the Plan.  Accordingly, even if the waiver claim did not expand the scope of coverage beyond what exists in the Plan, Plaintiff has failed to establish that Defendants intentionally forfeited their right to terminate Plaintiff's LTD benefits claim.  Therefore, summary judgment is entered in favor of Defendants on Plaintiff's claim for waiver.

### D.    MetLife's Claim for Reimbursement of Overpaid LTD Benefits

Finally, the Court turns to MetLife's counterclaim for reimbursement of all overpaid LTD benefits in accordance with Reed's obligations under the Plan.  Pursuant to the Plan, a participant's LTD benefits are offset by other income, including SSA benefits, Workers' Compensation

benefits, and third-party recoveries.  Here, MetLife seeks reimbursement of overpaid LTD benefits resulting from the receipt of such income from Reed pursuant to Section 502(a)(3).

Section 502(a)(3) provides that a fiduciary may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  The Supreme Court has held that a health plan administrator's claim to enforce a reimbursement clause constitutes appropriate "equitable relief" under section 502(a)(3) because the "claim for reimbursement . . . was the modern-day equivalent of an action in equity to enforce . . . a contract-based lien—called an 'equitable lien by agreement.'"  *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1544 (2013) (explaining that the basis for the claim was equitable because "a contract to convey a specific object not yet acquired creates a lien on that object as soon as the contractor gets a title to the thing") (quoting *Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356, 364-65 (2006)) (internal quotation marks and alterations omitted).  Accordingly, the Supreme Court found that the administrator could use section 502(a)(3) to obtain funds that its beneficiaries had promised to turn over.  *See id.*; *see also Sereboff*, 547 U.S. at 359, 369 (finding that an equitable lien by agreement was created by language in a Plan specifying a right to reimbursement from "[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise"); *Funk*, 648 F.3d at 195 (holding that an ERISA fiduciary could bring a claim for reimbursement under section 502(a)(3) for overpaid LTD benefits resulting from claimant's receipt of SSA benefits).  Likewise, here, where the Plan language specifies a right to reimbursement from income received from other sources, including SSA benefits, Workers' Compensation benefits, and third-party recoveries, (*see* ML 0136-39), MetLife may appropriately seek reimbursement from such income under Section 502(a)(3).

The plain language of the Plan provides that a participant is eligible to receive 60% of base pay reduced by other income, including, *inter alia*, SSA benefits received by the participant and the participant's spouse and dependents; benefits received pursuant to Workers' Compensation or similar laws; and "the amount of recovery [the participant] receive[s] for loss of income as a result of claims against a third party by judgment, settlement, or otherwise." (*Id.*) The Plan specifies that MetLife has "the right to recover from [the participant] any amount that we determine to be in Overpayment" and the participant has "the obligation to refund to us any such amount." (ML 0147.) Reed also executed an Agreement to Reimburse Overpayment of Long Term Disability Benefits ("Reimbursement Agreement"), expressly promising to repay MetLife all overpaid LTD benefits resulting from an award of SSA benefits or Workers' Compensation benefits. (*See* ML 1082.) The Reimbursement Agreement specifically provides that if a participant opts to receive his LTD benefits without reduction for benefits received from other sources, as Reed did, he must reimburse MetLife in full upon receipt of any offsetable monies received. (*See id.*)

Reed began receiving monthly LTD benefits on July 10, 2008. Shortly thereafter, on September 26, 2008, he executed the Reimbursement Agreement. Based on 60% of his predisability earnings, Reed was eligible for a gross monthly LTD benefit of $13,185. MetLife has submitted evidence indicating that, beginning December 1, 2011, Reed received an initial SSA benefits award of $1,801 per month, and his dependents received an award of $750 a month in total. (*See* Knepper Cert., Ex. 1.) Reed also accepted a settlement of his Workers' Compensation claim of $7,500, with $1,500 being paid to Reed's counsel and $400 towards costs for that action. (*Id.*, Ex. 2.) Reed has also advised that he has a pending third-party action against Champs Restaurant.

Overall, Reed received LTD benefits from July 10, 2008, through November 3, 2009, without consideration of applicable offsets—essentially allowing Reed to be paid twice. It is clear that the "[p]lan clearly contemplated precisely this scenario and expressly dictated that a beneficiary's [p]lan [b]enefits would be subject to an offset." *GE Grp. Life Assur. Co. v. Turner*, No. 05-342, 2009 U.S. Dist. LEXIS 3971, at *16 (W.D. Pa. Jan. 20, 2009); *see also Fahringer v. Paul Revere Ins. Co.*, 317 F. Supp. 2d 504, 520 (D.N.J. 2003) (finding that SSA dependent benefits should be offset from LTD benefits received under the terms of the plan). Accordingly, MetLife has a right to reimbursement of the $5,600 Reed was overpaid in benefits during the relevant period of time.

Indeed, Reed does not object to MetLife's right to reimbursement in the amount of $5,600, but only objects to any finding that MetLife has a right to reimbursement for any damages other than the recovery of lost income from his third-party claim. (*See* Pl.'s Opp. Br. 33-34.) The Court agrees. The plain language of the Plan clearly states that MetLife's right to reimbursement extends only to "the amount of recovery [the participant] receive[s] for **loss of income** as a result of claims against a third party by judgment, settlement or otherwise." (ML 0139.) In sum, pursuant to the applicable law, the terms of the Plan, and the Reimbursement Agreement, Defendants are entitled to summary judgment for the overpayment of LTD benefits to Reed as a result of his and his dependents' SSA award, Workers' Compensation settlement, and any third-party recovery he receives for loss of income. Reed's reimbursement of the overpaid LTD benefits alleviates the current inequity that exists, in which Reed has retained LTD benefits to which he is not entitled pursuant to the express terms of the Plan and Reimbursement Agreement. Accordingly, the Court orders Reed to reimburse MetLife $5,600, representing the overpayment of benefits resulting from his receipt of SSA benefits and Workers' Compensation Benefits, and orders Reed to reimburse

MetLife for the overpayment of LTD benefits that should result if Reed recovers loss of income relief in his third-party claim against Champs.

**IV.**   **Conclusion**

For the foregoing reasons, Plaintiff's motion for summary judgment is denied.  Defendants' motion for summary judgment is granted.  To the extent that Plaintiff moves to strike the Hallford Certification, such a motion is denied.  An appropriate order accompanies this Opinion.

_s/ Michael A. Shipp_____
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Dated: March 31, 2015